(78 South. 565)

No. 22265.

Succession of MINGO.

DELPIT et al. v. CANAL BANK & TRUST CO. (MINGO, Intervener).

(Nov. 26, 1917. On Rehearing, April 29, 1918.)

*(Syllabus by the Court.)*

1. SLAVES ⊜⊃25 — MARRIAGE — LEGITIMIZING ISSUE.

The Emancipation Proclamation, issued in January, 1863, and the state Constitution of 1864, though they abolished and prohibited slavery, did not affect the law of this state prohibiting marriages between free white persons and free people of color; and an attempted acknowledgment and legitimation by contract of marriage in 1865 between a white man and a colored woman of children who had been conceived and born when such marriages had been, as they still were, prohibited, on pain of nullity, produced no legal effect.

2. SLAVES ⊜⊃25 — MARRIAGE CONTRACT — LEGITIMATION—IDENTITY.

The statement, in a contract of marriage, "Furthermore, the children of both sexes, born to these two parties before their legitimate union, are, by this act, legitimized," is insufficient to identify the children referred to, either as to parentage, number, or name.

On Rehearing.

*(Additional Syllabus by Editorial Staff.)*

3. COURTS ⊜⊃224(2) — LOUISIANA SUPREME COURT—APPELLATE JURISDICTION.

Where the brothers and sisters of a decedent were by an ex parte judgment recognized to be heirs and sent into possession, and ruled a bank and trust company to show cause why it should not pay over a deposit left by decedent amounting to $736.50, and the bank deposited

such amount in court, and the decedent's surviving husband intervened, and for the first time tendered the issue of the heirs' legitimacy, of which question the Supreme Court alone has jurisdiction, the judgment in favor of intervener was appealable under Const. art. 95, declaring that an appeal from a judgment rendered on an incidental demand shall go to the court having jurisdiction of the main demand.

Appeal from Twenty-Fifth Judicial District Court, Parish of Tangipahoa; W. S. Rownd, Judge.

Ernest Delpit and others caused the succession of Victoria White Mingo to be opened, and obtained a judgment that they be put in possession as the heirs at law, and ruled the German American Branch of the Canal Louisiana Bank & Trust Company to show cause why it should not pay over an amount on deposit, and decedent's surviving husband, Smiley Mingo, intervened. Judgment for intervener, and the heirs appeal. Affirmed.

L. C. Moise, of Covington, for appellants. R. C. & S. Reid, of Amite, for appellee Smiley Mingo. R. C. & S. Reid, of Amite, and Dart, Kernan & Dart, of New Orleans, for appellee Canal Bank & Trust Co.

Statement of the Case.

MONROE, C. J. Victoria White Mingo, wife of Smiley Mingo, died, without issue, in the parish of Tangipahoa, in July, 1915, leaving certain sums of money, approximating $800, on deposit in two of the banks of New Orleans, and shortly thereafter Ernest Delpit and others (whom we shall call plaintiffs), appearing as her brothers and sisters, caused her succession to be opened and obtained a judgment ordering that they be put in possession, as her heirs at law, of such property and money as she had acquired prior to the month of November, 1909, and particularly of the money in the banks, alleging that the same was her separate property.

They then ruled the German American Branch of the Canal Louisiana Bank & Trust Company, in which there appears to be a deposit amounting to $736.50, requiring it to show cause on December 13th following why it should not pay over said deposit, to which the bank answered that it could not safely make the payment; that decedent was a married woman, and had left both separate and community property; that she had drawn out more money after 1909 than she then had on deposit; and that respondent was unable to ascertain what proportion of the amount on deposit at the time of her death belonged to her heirs, and what proportion to the pre-existing community; and respondent prayed to be dismissed with costs, or permitted to deposit the amount in its hands in the registry of the court, and that plaintiffs in rule and the surviving husband be cited to appear and litigate their respective claims. Thereupon the surviving husband intervened, alleging that Victoria Doucet, the mother of the decedent, was a slave at the time of the birth of her children, and the alleged father, Luke Delpit, a white man, and that no marriage could have taken place between them. Wherefore he prayed that the judgment sending plaintiffs into possession be annulled, and that he be recognized as the sole heir of his wife. Plaintiffs answered the intervention, the case was tried, mainly upon an agreed statement of facts, and there was judgment in favor of the intervener, from which plaintiffs prosecute this appeal.

It is admitted that Victoria Doucet was a slave of the African race "until emancipated by the Constitution and laws of the United States and of the state of Louisiana"; that she belonged to Luke Delpit, who was a white man, native of Italy, and naturalized citizen of the United States; that, after he became her owner, she bore the children whose names are given by plaintiffs in their original petition herein filed; and that she died in 1899, Delpit having died in 1867.

It is further admitted that "one of the daughters of Victoria Doucet" married —— White, and, after his death, married Smiley Mingo, and that, departing this life on July 30, 1915, she left no issue of either marriage. There is filed in evidence a certificate showing that Smiley Mingo and Victoria White were married on November 30, 1909, and there are two copies of recorded instruments, from which it appears that Luke Delpit and "Catherine Doucet" were married in New Orleans, with the blessing of the Catholic Church, on December 13, 1865—one of said instruments containing the following paragraph, to wit:

"Further, the children of both sexes born to these two parties before their legitimate union are, by this act, legitimized."

Farther than the admission "that, after the purchase of said slave, Victoria Doucet, by Luke Delpit, she bore the children whose names are given in the petition filed in this suit on October 30, 1915," there is nothing in the record, in the way of evidence, which tends to identify plaintiffs as the children referred to in the paragraph thus quoted, or to identify the Victoria Doucet mentioned in plaintiff's petition and in the statement of facts with the Catherine Doucet, named in the marriage certificates, as the person who became the wife of Luke Delpit. It seems, however, to be conceded in the briefs that the two names describe the same person.

### Opinion.

In December, 1865, when Luke Delpit and Catherine Doucet assumed to intermarry and to legitimate an unstated number of unnamed children, born to them "before their legitimate union," the Civil Code of Louisiana contained provisions declaring (article 95) that free persons and slaves were incapable of intermarriage, that the celebration of such marriages was prohibited and the marriages void, and that "there is the same incapacity and the same nullity with respect to marriages contracted by free white persons with free people of color"; further declaring (article 217) that children born out of marriage, "except those who are born from incestuous or adulterous connection, may be legitimated by the subsequent marriage of their father and mother whenever the latter have legally acknowledged them for their children, either before their marriage or by their contract of marriage itself"; that (article 221) "the acknowledgment of an illegitimate child shall be made by a declaration executed before a notary public, in the presence of two witnesses, whenever it shall not have been made in the registering of the birth or baptism of such child." No other proof of acknowledgment shall be admitted in favor of children of color; that (article 222) "such acknowledgment shall not be made in favor of the children produced by an incestuous or adulterous connection"; that (article 226) "illegitimate children who have not been legally acknowledged may be allowed to prove their paternal descent, provided they be free and white. Free illegitimate children of color may also be allowed to prove their descent from a father of color only"; that (article 230) "illegitimate children of every description may make proof of their maternal descent, provided the mother be not a married woman"; that (article 912) "natural children are called to the legal succession of their natural mother when they have been duly acknowledged by her, if she has left no lawful children or descendants, to the exclusion of her father and mother, * * * or collaterals of lawful kindred"; that (article 918) the wife, not separated from bed and board, inherits from the husband to the exclusion of natural children, but, where the husband survives, the natural child of the wife is preferred (but not the natural brothers and sisters).

[1] It is here argued on behalf of plain-

tiffs that the Emancipation Proclamation, issued in January, 1863, and the Constitution, adopted (or said to have been adopted) in this state in 1864, not only abolished and prohibited slavery in Louisiana, but also nullified those provisions of the state law prohibiting marriages between free white persons and free people of color; but our understanding of the matter is that, in such cases, the existing law is abrogated or nullified only to the extent that it conflicts with the later and higher law, and, as the question of marriage in this state was not a matter for the Proclamation to deal with, and was not referred to, either in the Proclamation or the Constitution, the existing law upon the subject was not affected by those instruments.

In 1868 (some three years after the attempted marriage between, and acknowledgment by, Luke Delpit and Catherine Doucet, and the year following the death of Doucet) a new state Constitution was adopted, followed by legislation concerning which this court has said:

"The Constitution of 1868 and the statutes subsequently passed * * * were designed to concede to all persons, without distinction or difference of race, or color or previous condition, the privileges of legally intermarrying and thereby legitimating their previously acknowledged issue," etc. Succession of Colwell, 34 La. Ann. 268.

The case thus cited was one in which the children of a white man by a colored woman claimed his succession to the exclusion of his sisters, and in which it appeared that the children were conceived and born during the period when their parents were prohibited on account of racial differences from intermarrying; that in 1878 (after that prohibition had been withdrawn, and after the enactment of a statute, Act 68 of 1870, which declared that natural children might be legitimated by notarial act, "provided that there existed at the time of the conception of such children no other legal impediments to the intermarriage of their natural father and

mother, except those resulting from color or the institution of slavery"), the parents had, by notarial act, declared their children legitimate and had thereafter intermarried. The court, through Bermudez, C. J., said:

"The question to be determined is, simply, whether the marriage * * * legitimated those children. * * * It is clear that if, at the celebration of the marriage, article 95 of the Civil Code of 1825 had preserved its original force, the question would be summarily solved in the negative—[Dupre v. Boulard's Ex'r] 10 [La.] Ann. 411; [Succession of Fletcher] 11 [La.] Ann. 59; [Succession of Minvielle] 15 [La.] Ann. 342; [Kinney v. Commonwealth] 30 Grat. [Va.] 858 [32 Am. Rep. 690]—as the marriage would have taken place in the very teeth of a local prohibitory law, and so would have been absolutely null. * * * The fact that the article was expunged from the Revised Civil Code of 1870 is highly significant and telling. * * * In consequence of that repeal the marriage could be, and was, legally contracted."

And after an extended consideration of the changes which had been made in the law by the Constitution of 1868 and the legislation which followed, the court held that:

"Children conceived by persons who at the time were prohibited from contracting marriage on account of disparity of race may, after being duly acknowledged, be legitimated and given the right of heirs, by the marriage of their authors, [duly] celebrated after the impediment has been removed by law."

[2] In the instant case, article 95 of the Code, and the other provisions to which we have referred, having, as we have stated, been in force when the marriage and acknowledgment by Luke Delpit and Catherine Doucet were attempted, that attempt was in violation of a prohibitory law, founded in public policy, and accomplished no legal result, from which it follows that the plaintiffs continued to be unacknowledged natural children; but whether issue of the connection between Luke Delpit and Victoria (or Catherine) Doucet, this record does not enable us to determine, it being admitted, merely, that after her purchase by Delpit "Victoria Doucet bore the children whose names are given in the petition filed in this suit on October 30,

1915," to which it may be added that in the instrument whereby it is said that plaintiffs were acknowledged and legitimated they are referred to without other identification than the following:

"Furthermore, the children of both sexes born to these parties before their legitimate union are, by this act, legitimated."

The case, therefore, falls under the second paragraph of article 918 of the Civil Code, which declares, in effect, that the surviving husband, not separated in bed and board from his wife (in this instance, the intervener), inherits her estate, in the absence of "lawful" ascendants, descendants, collaterals, or natural children, "duly acknowledged." Succession of Ducloslange, 1 La. Ann. 182; Id., 2 La. Ann. 98; Succession of Briscoe, 2 La. Ann. 268; Montegut v. Bacas, Ex'r, 42 La. Ann. 158, 7 South. 449; In re Nereaux Estate 112 La. 574, 36 South. 594.

The judgment appealed from is therefore affirmed.

### On Rehearing.

O'NIELL, J. [3] The rehearing granted in this case was restricted to the question whether this court has jurisdiction. The doubt arose from the fact that the amount of money involved in the original proceeding by rule on the bank was only $736.50.

Our conclusion is that we have jurisdiction of the appeal from the judgment decreeing the plaintiffs in the rule to be illegitimate and annulling, for that reason, the ex parte judgment by which they had been recognized to be the heirs of their deceased sister and sent into possession of her estate. The question of legitimacy of the plaintiffs was not put at issue either by the plaintiffs or the defendant in the summary proceeding against the bank. The only question submitted in the bank's answer to the rule was whether the fund on deposit belonged entirely to the succession of Victoria White Mingo or partly to the marital community, theretofore exist-

ing between her and Smiley Mingo. As the bank had no interest in that question, it deposited the fund in court and passed out of the case without any contest whatever.

Then appeared the so-called intervener, Smiley Mingo, and sued to have the original plaintiffs declared illegitimate, and to have the judgment recognizing them as legitimate heirs decreed null and void. Although in the prayer of his petition he called it a "petition of intervention," it was couched in the language of an original petition, and was addressed to the court as such. It tendered, for the first time, an issue of which this court alone has jurisdiction; that is, the question of legitimacy of the defendants in the so-called intervention. At that time there was no other contest or suit in which the suit of the so-called intervenor could be considered an intervention or incidental demand. Article 95 of the Constitution declares that an appeal from a judgment rendered on an incidental demand shall go to the court having jurisdiction of the main demand. The purpose of that constitutional provision, as explained in Thompson v. McCausland, 137 La. 13, 68 South. 196, was to bring before one and the same appellate court the judgment on the main and incidental demands in one and the same suit. But if, as in this case, the so-called intervention is the only demand or contest before the court, it cannot be regarded as an incidental demand. Nor can it be said to follow the main demand, as far as appellate jurisdiction is concerned, since there is no other contest to be called the main demand. In the decision cited above, it was held that a judgment rendered on a reconventional demand, after discontinuance of the main demand, was appealable to the court having jurisdiction of the amount in contest in the reconventional demand, because there was then no other demand. On the same principle, we conclude that the judgment rendered on the so-called petition of intervention in this case was appealable to the court that

would have had jurisdiction of the demand if it had been an original suit.

The opinion and decree heretofore rendered herein is reinstated and made final.